IN THE DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NWB DISTRIBUTION, L.P. | § | |
| *Plaintiff* | § | |
| | § | |
| V. | § | |
| | § | CIVIL ACTION No.: |
| ALEC J. DONN, VINE & CO, LLC, and | § | |
| VINE&CO, LLC | § | |
| *Defendant* | § | |
| | § | |

**PLAINTIFF'S VERIFIED COMPLAINT AND APPLICATION FOR AN EMERGENCY
EX PARTE TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION
AND PERMANENT INJUNCTION**

Plaintiff, NWB Distribution, L.P., sues Defendant, Alec J. Donn, and alleges:

## I.    JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction pursuant to 15 U.S.C. § 1121(a) and 28

U.S.C. § 1338(a) as to claims asserted under the Lanham Act, 15 U.S.C. § 1051, et seq. This Court

also has original jurisdiction over the claim of unfair competition pursuant to 28 U.S.C. § 1338(b).

2.      This Court has original subject matter jurisdiction as to the claims other than those based

on the Lanham Act, under 28 U.S.C. § 1367, because those claims are so related to the claims

brought under the Lanham Act that they form a part of the same case or controversy.

3.      Further, an actual justiciable controversy now exists between the parties, and the requested

relief is proper under 28 U.S.C §§ 2201-2202.

4.      Venue is appropriate in this district under 28 U.S.C. § 1391(b) because a substantial part of

the events or omissions giving rise to the claim occurred in this district, and the defendant is subject

to the court's jurisdiction with respect to this action in this district.

## II.    PARTIES

5. Plaintiff, NWB Distribution, L.P. ("NWB"), is a Texas limited partnership, having its principal place of business in Harris County, Texas.

6. Defendant, Alec Donn, is an individual who resides at 2490 S. Loop 336 W, Apt 2541, Conroe, Texas 77304.

7. Defendant Vine & Co, LLC is a Texas limited liability company whose registered address is 2490 S Loop 336 W, Apt. 2541, Conroe, Texas 77304-3742.

8. Defendants Vine&Co, LLC is an Idaho limited liability company with its registered address at 2278 E Walling Drive, Boise, ID 83712-8468.

9. At all times complained of, Defendant Alec Donn ("Donn") is the beneficial owner and manager of all of the corporate defendants in this case and primarily resides in the State of Texas. At all times relevant herein, Vine&Co, LLC and Vine & Co, LLC were completely controlled by Kasdon, who acted at his behest to accomplish the causes of action set forth herein. Donn has formulated, directed, controlled, had the authority to control the corporate entities, and they participated in the acts and practices of Donn as described herein that constitute a joint and/or common enterprise and/or Conspiracy. There is also such a unity of interest between Donn and Vine&Co, LLC and Vine & Co, LLC, that they are an alter ego of these sham companies. All the above-described companies are dominated and controlled by Donn directly or through others he directly controls that have been involved in the schemes described hereinbelow. Both Vine&CO, LLC and Vine & Co, LLC were created to facilitate Donn's deceptive, fraudulent and unlawful activities described herein.

### III. <u>INTRODUCTION</u>

10. Over the last twenty months, Defendant Donn, using his two Defendant LLCs, brazenly embezzled at least $940,659.66 worth of profits from NWB while employed as its Sales Director.

Donn ran a theft ring inside of NWB's own warehouse to supply his alter ego companies Vine&Co, LLC and Vine & Co, LLC with stolen goods to sell to their customers. Donn secretly initiated shipments of NWB's inventory to unwitting NWB customers who thought they were purchasing products from NWB, while redirecting their payments for the products into his personal bank account in Idaho, which he falsely represented was a bank account for Vine & Co, LLC. His embezzling methods, as discussed below, were based on his position of trust at NWB and his knowledge of NWB's computer systems and shipping department.

11.     Over the last twenty months, Donn used his access to NWB products to form the basis of a new venture wherein he claimed he was part owner of NWB as he hired six people to help sell the stolen products. *See* **Exhibit C**.

12.     To add insult to injury, after NWB discovered the theft and terminated Donn's employment, Donn continued to hold himself out as a shareholding partner at NWB, displaying NWB's "EXP" trademarks on his email signature block when he sent invoices or piece sheets to NWB's customers (in violation of the Lanham Act) as he tried to continue to sell them products that he stole from NWB.

13.     In further violation of federal law, Donn is also using NWB's proprietary and trade secret customer list to continue to try to do business with NWB's customers as of the date of this filing. Two of NWB's customers have forwarded emails from Donn to the Plaintiff showing Donn's continued use of the marks which are attached hereto as **Exhibit D & F**.

## IV.     FACTS

### A.  The NWB Distribution Trademarks &Trade Secrets

14.     NWB is a direct distributor of beverages, soft drinks, all natural herbal goods, and other, related products to mid-sized merchants and convenience stores, such as Circle K. It also sells its

products directly to the public. NWB has its warehouses, sales offices, laboratories, manufacturing facilities, and shipping zone all located in the same campus in north Houston, Texas. NWB has been in business since 2016 under various predecessor entities.

15.     Through the expenditure of time, skill, effort, and money, NWB developed the "EXP" Marks, which have been used in the development, organization, and operation of its system of distributing beverages, soft drinks, all natural herbal goods, and other, related products to large and mid-sized merchants for resale, all under the label of the "EXP" Marks.

16.     NWB has developed the EXP Marks for use in the operation of its business, which includes the following principal trademarks, which has been registered by NWB on the Principal Register of the United States Patent and Trademark Office ("USPTO"):

| MARK | Registration No. | Registration Date |
|------|------------------|-------------------|
| EXP | 90529275 | September 28, 2021 |
| Experience Botanicals | 90363337 | September 28, 2021 |
| E$^2$ EXP Kratom | 6338402 | May 4, 2021 |

17.     The foregoing registrations are valid, subsisting, in full force and effect, and cover the goods and services identified in the registration certificates. The registration is incontestable under the Lanham Act, 15 U.S.C. § 1065. A copy of the certificates of registration are attached hereto as **Exhibit A**.

18.     The EXP Marks have been used exclusively by NWB, and its designated licensees, in commerce in connection with the operation of NWB's business since May 4, 2021. Since that time, NWB has grown its distribution network nationwide.

19.     The EXP Marks have become a valuable asset of substantial and inestimable worth to NWB. The EXP Marks are a symbol of extremely high-quality products, and timely service &

4

delivery of the same. NWB has a vital economic interest in protecting its name and the EXP Marks. The preservation and protection of its name and the EXP Marks is essential for the maintenance of the goodwill and reputation associated with them.

20.     Since 2016, NWB and its predecessors have also built and grown an extensive and proprietary customer list, which is kept secret from the public. As NWB entered into agreements for the distribution of its EXP products at various locations throughout the United States, its customer list grew considerably.  And the list is not just a list; the customer list includes *all* transactional information about each of NWB's customers since 2016, including their purchase cycles, amounts, and preferences, as well as their contact information and location, among other personal facts. The customer list is a valuable asset of substantial and inestimable worth to NWB.

21.     NWB goes to great lengths to keep their trade secret and proprietary customer information secret and out of the hands of general public.

### B.  NWB HIRED ALEC DONN TO LEAD ITS SALES DEPARTMENT

22.     After NWB's former Sales Director resigned, Alec Donn (then a Sales Director at another company in Idaho) learned that NWB was looking for a new sales director in Houston.

23.     On or around August 25, 2022, Donn suggested he could be the next sales director for NWB, as well as its business-to-business ("B2B") brand "EXP".[1] He agreed to come to Houston, Texas to NWB's facilities to meet NWB's staff and to take a tour of the various offices and warehousing. On or around September 9, 2022, NWB booked a flight for Donn to come to Houston Texas to visit the facility and meet our team to see if he was a good fit.

---

[1] NWB has a business-to-consumers branch ("B2C"), and its business-to-business branch ("B2B") called "EXP" which distributes consumer products to other businesses in volume.

24.     During Donn's visit, he agreed to take the position as Sales Director. NWB set up a company email for Donn's use under NWB's domain on September 12, 2022.

### C.  DONN IMMEDIATELY MADE CHANGES

25.     Immediately after hiring him, he began setting up new pricing sheets for all of NWB's products and requested a new sales website for B2B customers be built under a new platform NWB was unfamiliar with called "BigCommerce." This was despite the fact that NWB already had a website for sales customers that could be easily expanded for business customers.

26.     Donn assured NWB that he would be able to build the new website to do what NWB was familiar with, but insisted NWB use his system because he was more familiar with its use.

27.     After discussion, NWB agreed to his new system and paid for building and hosting of the new website on one of NWB's domains.

28.     On or around November 9, 2022, the new sales site was up and running. NWB's in-house design team created the graphics for the website, while NWB linked its credit card processing accounts and all of its customer and shipping accounts to the website.

29.     By December 17, 2022, Donn knew all the products, dimensions, SKU's & weights of all the products NWB sold.

30.     Around the same time, Donn suggested NWB should partner with Donn in a new project he was working on called "Vine Collective." Vine Collective sold mushroom and hemp products in Idaho, most of which were illegal to sell in Texas.

31.     Donn offered to give NWB shares in this new company in exchange for placement of Vine Collective products on NWB's websites. NWB rejected Donn's offer, and also instructed Donn that he must run his private business in his own private time. NWB further instructed Donn to ensure that his side-business would not interfere with his ability to do his job as a sales director

for NWB. Donn agreed and assured NWB he would keep Vine Collective separate from his work at NWB.

32.     On or around January 16, 2023, Donn suggested that NWB create EXP email addresses for everyone on the B2B sales team. This would separate the cards and email addresses given to the B2C customers from the B2B customers to avoid any confusion over which type of customer they were. NWB approved of the change and directed its in-house graphic designer to create the new business cards.

33.     Unknown to NWB management, Donn had the graphic designer include his side-business' name, "Vine Collective," on the bottom of his NWB business card, lying to the graphic designer that he had agreement with NWB to do so. Donn used the cards for several months while telling NWB customers Vine Collective and NWB were newly partnered entities.

34.     On January 17, 2023, Donn mentioned he wanted to "clean house" in his new department and terminate several of the legacy sales team members that were NWB employees for many years. Donn claimed it would save money to streamline the sales department.

35.     On January 26, 2023, Donn followed through with his idea, effectively eliminating all of the other NWB employees that had administrative access to the backend of the new sales system he recently had NWB construct. Donn said he operated better alone, only needing two assistants to deal with customer requests. Accordingly, NWB provided him with two assistants.

36.     On March 20, 2023, NWB paid for Donn's move to a new residence in the Houston area so he could build up the sales department and develop the sales systems in the Houston office.

37.     On December 11, 2023, one of NWB's office managers discovered Donn changed his number in the business telephone system so that calls to the sales department went to a cell phone number in California that was only accessible by him. When confronted by the CEO, who told him

he had to take all sales calls to the office phones so someone else could handle the sale if he was out, Donn claimed someone else at NWB must have changed it. The number was changed back to the office.

38.     After completing an internal audit of the calls received to Donn's private California number, NWB found that Donn took several sales calls a week in that manner, circumventing NWB completely.

39.     On or about February 8, 2024, NWB paid airfare/hotel/expenses for Donn to attend the "Champs Trade Show" in Las Vegas, Nevada. Donn was introduced to NWB's customers at the trade show as its new Sales Director. During the trade show, other attendees noticed Donn using the "EXP" business card with "Vine Collective" printed on the under EXP. Again, the CEO of NWB told Donn that NWB never authorized him to put another business name on the company cards. The CEO also told Donn to replace the unauthorized cards immediately after the trade show with cards that only included NWB's "EXP" brand.

### D.  DONN'S SALES BECAME SUSPICIOUS

40.     After Donn worked as Sales Manager for NWB for a year, NWB's CPA performed an audit on the new sales system Donn was managing. The CPA noticed that Donn had been invoicing customers for amounts that were below NWB's cost on almost every order he managed for large business purchases.

41.     When NWB's accountants noticed there were missing proceeds from the sales Donn claimed to have made, he denied them full access to the BigCommerce platform and sent them reports that made no sense, mathematically. When asked to give them full access, he would promise to walk them through it, but never did so.

DocuSign Envelope ID: 8B82C52C-9A1C-46C5-B7EB-E9BD0A80C5E9

42.     After discovering the pricing issues, the CEO met with Donn to reiterate that NWB could not sell below the prices it pays for products, and reiterated NWB's process for pricing for each customer. Donn told the CEO that some of the sales were made in error, while other sales were priced low as part of a promotional plan he was developing.

43.     As an example of one of the underpriced sales, Donn appeared to sell several products below NWB's cost on a February 11, 2023 sale to Discount Wholesale. NWB's cost for the products on that invoice were over $14,000.00 with an MSRP of approximately $28,000.00, yet Donn only invoiced the buyer $14,000.00. Thus, that single transaction cost NWB the amount of the expected profit of $14,000.00, plus the amount of NWB's actual cost for the product, plus the 3% credit card processing fee that came out of the funds NWB received.

44.     After the conversation about pricing, NWB was forced to cancel several of these underpriced sales and refund payments. The CEO told Donn to get all the pricing corrected before he makes any further offers to sell to any customers. The CEO also demanded the login-in information for the new sales system because the one Donn gave him did not work.

45.     On May 20, 2023, Donn gave the CEO the real login password: **EXPVine**. Donn also sent the CEO the URL for the new sales system: **expvine.zendesk.com**. When asked why they both had the trademark "EXP" next to Donn's "Vine" logo, Donn explained that he put his "Vine Collective" business name next to NWB's trademark because he created NWB's system from an old version for his business he previously created, so he just added EXP to it.[2]

46.     As a result, NWB discovered the word "Vine" was attached to the URL connected to the customer relationship management system and the logo for Vine Collective was seen next to NWB's trademark "EXP" by NWB customers *every time they made and order from NWB.* It was

---

[2] This was untrue because NWB paid for the creation of the system using its business credit card, after Donn became an employee.

also later discovered that <u>Donn was telling every customer that made a purchase that NWB and Vine Collective were 50/50 partners, so payments to Vine Collective were just as good as payments to NWB</u>.

47.     On March 1, 2024, Donn suddenly announced to NWB management that he intended to leave the company to shift his focus to his other business, Vine Collective, since he was allegedly "making a lot of money from it."  He said that he was willing to transition to a consulting position to finish building-out NWB's sales team, remotely, for $48,000 a year.  This was after he had terminated many of our previous sales people, and caused several others to leave.

### E.  DONN'S THEFT WAS FULLY DISCOVERED

48.     On March 6, 2024, while Donn was out of the office, NWB received a call from one of its customers, McDonald, who threatened to sue NWB if his $4,305.00 payment was not refunded on an order he had made three weeks earlier that never arrived. NWB asked McDonald to send us the invoice that he received, because none was showing up in NWB's system. Unbelievably, the invoice McDonald sent back was made out to "Vine Collective," Donn's personal company he ran on the side. McDonald also sent us his payment confirmation showing that his money was paid to "Vine Collective" on February 16, 2024.

49.     NWB realized Donn was running his own distribution company using NWB's products. He was paying for products near cost, then invoicing the customers the MSRP, which is normally around double the cost. Donn was making *a lot* of money.

50.     On March 9, 2024, NWB undertook a two-day review of all NWB invoices and discovered numerous other instances of theft where he made it appear he sold products to customers at cost. The total amount of the uncollected profit discovered during the initial audit on May 9, 2024 was **<u>$338,796.92</u>**.

51.     The audit revealed in detail how Donn's so-called "pricing errors" were actually Donn's main method of running his own secret, illegal distribution business from inside NWB's facilities, using NWB's products to make one hundred percent profit on every "sale" he made to unwitting NWB customers. The audit also revealed that Donn was billing NWB customers using invoices he created outside of NWB's system that directed NWB's customers to make their payment (meant for NWB) to his personal bank account in Idaho.

52.     On March 10, 2024, NWB disabled Donn's access to the entire invoicing and inventory system. It also deactivated Donn's email account. When NWB attempted to recover NWB's CRM system that keeps all the names and details of NWB's customers (the "customer list"), it was discovered Donn had revoked everyone else's access.

53.     On March 11, 2024, NWB employees were able to regain access to its customer list by contacting Zendesk's corporate support and providing proof of ownership of the files.

54.     After seizing Donn's computer that same day, more of Donn's much wider operation was discovered. <u>The computer files further confirmed that Donn had a secret sales team outside of the company, whose contact information Donn gave to NWB customers who intended to make purchases from NWB and/or EXP</u>. Donn was slowly transitioning NW customers to his own distribution company.

55.     Over that weekend, NWB's attorney drew up the termination papers for serving on Donn that following Monday. When Donn arrived March 11, 2024, he was presented with the termination documents that set forth the extensive theft uncovered. The Termination Notice is attached as Exhibit E.

56.     After a more thorough audit of NWB files during the still-pending police investigation, NWB discovered Donn sold **$940,659.66** worth of products using approximately sixty phony sales to NWB customers using his own credit card, along with a number of other methods.

### F.  DONN'S EMBEZZLEMENT METHODS

*Manual Falsification of Invoices*

57.     First, most of Donn's theft was made possible because of a "manual confirmation of sale" bridge between the customer invoicing system that he built in "BigCommerce," and NWB's current invoicing/shipping system that it uses called "Fishbowl." Each time he initiated a sale from the warehouse, he entered numerous, manual confirmations that sales had been paid in full, even though they had not. He was able to mark those invoices "paid" by secretly paying some small dollar amount using his personal credit card, while simultaneously falsely entering the customer's name as the owner of the credit card. This got the shipping process started. Then when the products shipped to the customer, he included an invoice with his Vine Collective logo next to the EXP trademark, with payment links to his personal bank account in Idaho.

58.     The most recent audit also uncovered Donn used *his personal credit card* to start the shipment process on at least sixty shipments, but he tried to cover it up. Each purchase indicated the NWB customer's name next to Donn's credit card number—with Donn's billing zip code swapped out of the Customers' addresses so the initial small payment would be accepted by the payment processor's system.

59.     This system netted him the entire profit NWB would have made at MSRP, and left NWB with an actual loss on each transaction because the initiating payment never covered the cost of the products sold.

60.     Donn also ran the same scheme using *his personal checks* when he couldn't use his credit

card. The following are a few examples of his transactions:

- Donn paid NWB $8,786.00 with his personal credit card after he generated a fake invoice number SNWB-4829 to a customer named Ambedo Naturals, allegedly for $9,761.00 worth of products. Donn then had the shipping department ship $75,723.50 worth of products to Ambedo while he secretly invoicing them using a Vine Collective invoice. This was a loss of $65,962.50 to NWB, while the profit to Donn could be as high as $100,000.00 on this single transaction.

- For Order 1214 to Mak Enterprise Group, the invoice says $1,560.00, for $2,598.96 worth of products. This invoice was marked paid, by Alec Donn, for which he paid NWB $390.00. This was a loss of $2,208.96.

- For Order 1262 for Inland Botanicals, Donn removed back-stocked products from NWB's warehouse that merely *appeared* to be what Inland ordered. He knew it would be a while before anyone noticed it was missing. Donn then reprinted labels from his home on an inkjet printer, so the products label matched what Inland ordered. He then charged the customer $3,115.00 for the fake products using his own bank account.

- On December 6, 2023, our customer Optima ordered a large amount of product. It was packed and delivered to them by our shipping team. The customer was then invoiced by Vine Collective for $10,500.00 on October 3, 2023, $11,050.00 on December 6, 2023, and $11,050.00. There were also charges for $9,800.00, $10,969.62. This was a theft of $53,369.62.

- Order SB2B-824 showed our customer was shipped $9,800.00 worth of products at NWB's cost but was invoiced by Vine Collective for $10,969.62. The invoice was marked paid in our system but was delivered to the customer. This was a total loss to NWB of $9,800.00.

61.     NWB has discovered a hundred other similar transactions. There are still over a thousand

remaining invoices under investigation. A spreadsheet of the faked purchases discovered so far is

attached as Exhibit B.

*White Rabbit Scheme*

62.     NWB also has a "drop shipping" business. It allows other businesses to sell products on

their own websites that are shipped to the customers directly from NWB's warehouse or a

warehouse of NWB's choosing. NWB ships seltzer waters and branded refrigerators to

convenience stores in this manner.

63.     Donn was placing orders on one of NWB's customers' websites for shipment from NWB, *using NWB's business credit card*. This resulted in NWB's warehouse shipping products directly to Donn's customers, but purchased by NWB, whom he then invoiced using his EXP/Vine Collective branded invoices.

64.     NWB has discovered at least ten of these transactions so far. The largest transaction of this type was invoiced at $24,000.00 plus the value of the product shipped for free from NWB's warehouse.  That customer confirmed that she made her payments to Donn at Vine Collective.

*Donn Misrepresentations*

65.     Of the customers NWB has been able to confer with about this situation, most have sent their proof of payments via wire transfer to "EXP/Vine Collective." They all confirmed they believed they were paying NWB when they paid Vine Collective because of the way the logo was being used, and because Donn was a sales manager for NWB. The confusion was escalated by Donn by putting both "EXP" and "Vine Collective" on customer facing websites he created.

66.     Donn also told each of them that he was a shareholder of EXP and NWB and that he was NWB's partner.

*Credit Card Fraud*

67.     Incredibly, over the past few days, Donn has continued attempting to charge NWB's company credit card for thousands of dollars for personal use such as food delivery.

*Trade-Show Theft*

68.     Lastly, Donn took $32,363.44 worth of products (at NWB's cost) for use at trade shows as an EXP spokesman in January of 2024. None of it was returned to NWB, nor used at any tradeshows for NWB.

69.     Upon information and belief, Donn took approximately $100,000.00 worth of products to start up his new venture.

### G.  DONN'S ACTIONS AFTER TERMINATION

70.     Since his termination, Donn stopped communicating with NWB and blocked the officers of NWB on his social media. <u>He has continued contacting NWB's suppliers to get them to cancel their contracts with NWB and sell directly to him to bypass NWB. He is also contacting NWB customers using NWB's trade secret and proprietary customer list to try to get them to wire him more money.</u>  He is also contacting NWB customers to continue to solicit them.

71.     On April 30, 2024, NWB received an envelope with two checks for a total of $1,700.00, with a notation that if the checks were cashed, it would settle all matters between NWB and Donn.

72.     On May 1, 2024, Donn sent an email to one of NWB's customers using the customer list he stole. *<u>The signature block on his email still included both his "Vine" logo, as well as NWB's trademark EXP</u>*, similarly to how he has been confusing NWB's customers for the last twenty months:



### H.  DONN'S USE OF THE EXP TRADEMARK NEXT TO THE VINE LOGO CAUSES CUSTOMER CONFUSION ON PURPOSE

73.     To the general public, Donn's use of the EXP trademark next to his Vine logo, makes it appear as if he is in a partnership with NWB. <u>The confusion was and still is his intent because he actually represented himself as an owner of NWB to NWB's customers</u>. It allowed him to redirect funds to himself meant for NWB while he worked for NWB. It is still allowing him to email NWB customers (using the stolen customer list) while appearing to have NWB's authority to discuss NWB's business and to suggest the customer move their business over to his full-time.

74.     Donn's theft-business model included theft of NWB's products for sending to customers under the guise of Donn's partnership with NWB. Indeed, <u>Donn invented an entirely imaginary partnership wherein he owned shares in both Vine Collective and NWB, and was authorized to hire employees to sell NWB products under Vine Collective, the d/b/a for both of his companies, Vine & Co, LLC and Vine&Co, LLC.  He actually hired six people as part of this imaginary partnership, while pretending he controlled the graphic department at NWB, and while pretending he owned the inventory of NWB</u>. Most of the sales made through his imaginary partnership were not handled timely because Donn could not get the stolen NWB merchandise shipped fast enough. As a result, many of the customers who were taken in by Donn's use of NWB's marks while he sold them stolen products have vowed never to do business with NWB again.

75.     One of the people Donn hired to work for him as a "partner" of NWB, Dave Friesen, believed he was working for NWB and Vine Collective when he took the job. *See* **Exhibit C**. Friesen turned over a list to NWB of the sixteen customers he sold NWB products to (believing he was an NWB contractor). The list is attached to the Declaration of Friesen attached as **Exhibit C**. Friesen made a total of sixteen sales, where nine of the sales were never fulfilled because Donn could not steal the products from NWB's warehouse fast enough. Friesen also turned over the price list Donn gave him, including EXP products, for Friesen to use in his job for Vine Collective.

Friesen also turned over the ACH form he was directed to give to his customers, which displays the EXP trademark prominently on the top of the page. Exhibit C.

76.     The recent email he sent to one of the customers from NWB's customer list, to try to get the customer to move to his new company, still includes the EXP logo in the signature. **Exhibit D**. Indeed, Donn is communicating with all of NWB's customers with the same signature block. **Exhibit F**.

77.     As of the date of this filing, Defendant is clearly intending to continue using the NWB Mark and customer list, in violation of federal law. NWB has, and will continue to lose, business, goodwill, and customers if Defendant Donn continues to infringe on Plaintiff's Marks. Further, due to Defendant Donn's use of NWB marks, Plaintiff has lost the power to control its reputation and place in the market. Plaintiff has also suffered losses to its reputation and goodwill that cannot be quantified. Thus, the damage to NWB cannot not be undone by monetary remedies.

78.     Additionally, as this is an exceptional case of trademark infringement based upon Defendant's deliberate, willful, and bad faith acts of infringement, Plaintiff is also entitled to recover its attorneys fees under 15 U.S.C. § 1117(a).

## V.     CAUSES OF ACTION

### COUNT I:
### TRADEMARK INFRINGEMENT, UNFAIR COMPETITION,
### AND FALSE DESIGNATION OF ORIGIN
### (15 U.S.C. § 1125(a) and Common Law)

79.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 73 hereof.

80.     NWB has spent substantial sums to promote, and has generated substantial revenue and recognition from, the NWB Marks, which are distinctive.

81.     The distinctive NWB Marks have become impressed upon the minds of the trade and public in identifying NWB products and services, as part of a national distribution network, and

DocuSign Envelope ID: 9B82C52C-9A1C-46C5-B3EB-E0BD0A80C5E9

consumers understand the marks and logos to indicate the source or origin of such products and services provided in connection with NWB's reputation for quality.

82.     NWB has developed a large and valuable distribution system through its use of the NWB Marks, and the reputation and goodwill in that mark is of great value to NWB.

83.     Defendant has used in commerce the NWB Mark without NWB' consent or authorization.

84.     Such use of the NWB Mark is likely to confuse consumers into believing that Defendant is associated with, endorsed by, or sponsored by NWB, when his is not.

85.     Defendant' conduct constitutes false designation of origin, and unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125(a), and common law.

**COUNT II: TRADEMARK INFRINGEMENT**
**(15 U.S.C. § 1114)**

86.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 80 hereof.

87.     NWB owns three federal registrations for the NWB Marks in connection with its NWB services, namely, U.S. Reg. No. 90529275; 90363337; and 6338402, (the "Registrations").

88.     The Registrations serve as prima facie evidence of the validity of the registered mark and of NWB's ownership of the NWB Marks and exclusive right to use the marks in commerce pursuant to 15 U.S.C. § 1115(a).

89.     Defendant has used the registered marks in connection with the sale, offering for sale, distribution, and advertising of foods and services in a manner likely to cause confusion, or to cause mistake, or to deceive.

90.     Defendant's conduct constitutes trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

91.     Defendant's willful and intentional actions have caused, and unless restrained by this Court, will continue to cause irreparable harm and injury to NWB.

92.     NWB has no adequate remedy at law.

## COUNT III:
## TRADEMARK DILUTION
## (15 U.S.C. § 1125(c))

93.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 87 hereof.

94.     The NWB Marks are famous trademarks under Section 43(c) of the Lanham Act, 15 U.S.C.

§ 1125(c).

95.     Defendant' action and conduct, as set forth herein, constitute dilution of the famous Marks

under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

96.     NWB is entitled to injunctive relief under Section 43(c)(1) of the Lanham Act, 15 U.S.C.

§ 1125(c)(1).

97.     As a direct and proximate result of Defendant's wrongful conduct, NWB has suffered and

will continue to suffer irreparable damage to reputation and goodwill for which it has no adequate

remedy at law.

98.     Pursuant to 15 U.S.C. § 1117, NWB is entitled to recover damages from Defendant caused

by his unlawful use of the NWB Mark, in an amount to be determined at trial.

## COUNT IV:
## TEXAS UNIFORM TRADE SECRETS ACT
## TEX. CIV. PRAC. & REM. CODE §§ 134A.002

99.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 93 hereof.

100.    Defendant has also violated the Texas Uniform Trade Secrets Act by taking and using

NWB's confidential customer information without NWB's authorization to solicit away NWB's

customers.

101.    NWB took all reasonable efforts to keep its customer information secret.

102.    The customer list has actual or potential economic value to third parties because it is generally not known to the public, and is not readily ascertainable through proper means, and because it contains the names and contact information for people who will purchase the products that the Defendant is attempting to sell, relieving him of the need to grow his own business through advertising, word of mouth, or otherwise, and giving him access to NWB's entire customer base.

103.    NWB kept its customer information on servers that were not accessible by anyone without a proper access code. No one outside of NWB has such an access code.

104.    The confidential customer information is also valuable to the Defendant in that it will allow him to continue siphoning off sales from the Plaintiff, and to continue to harm the reputation of the Plaintiff by giving NWB's customers slow and poor service under the guise of being partnered with NWB.

105.    Moreover, the information in the confidential customer list took NWB eight years to compile, which the Defendant is using to his advantage without any effort whatsoever.

106.    Since the Defendant began soliciting NWB's customers as a partner of NWB, at least ten customers have vowed to never use NWB's services again as a result of the poor handling of their orders, which they blame on NWB, even though the poor service was a result of Defendant's slow theft of products to fulfill the orders.

107.    NWB is entitled to injunctive relief under the TUTSA.

108.    NWB is also intitled to its actual damages under the TUTSA, as well as the value of the unjust enrichment the Defendant has gained caused be the misappropriation of the confidential information.

109.    NWB is also entitled to exemplary damages, pre and post judgment interest, and its reasonable and necessary attorney fees, as well as court costs.

## COUNT V:
## BREACH OF FIDUCIARY DUTY

110.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 104 hereof.

111.    Defendant owed NWB a fiduciary duty during the time he was an employee of NWB as NWB's sales manager. As the sales manager for NWB, Donn was given complete access to all of the company's servers, systems and confidential information. Donn was allowed to create new systems using the confidential information he was given access to for the benefit of NWB.

112.    Donn breached his duty of loyalty and utmost good faith.

113.    Donn breached his duty to refrain from self-dealing by taking the profits from each secret sale he made using NWB's products and shipping department, and through all acts complained of above.

114.    Donn breached his duty of fair and honest dealings by the actions complained of above.

115.    Donn breached his duty of full disclosure.

116.    Because Donn entered into transactions with NWB's customers without the knowledge of, or any payments to NWB, there is a presumption of unfairness with regard to all the transactions Donn made in secret.

117.    Donn's actions proximately caused NWB to lose all the profits from sales of NWB's products he secretly initiated, for a loss of at least $940,659.66.

118.    Plaintiff seeks its economic damages, reasonable and necessary attorney's fees, and court costs, and is entitled to exemplary damages for Donn's breach of his fiduciary duty to NWB.

119.    Plaintiff is also entitled to injunctive relief in the form of profit disgorgement, receivership, and a constructive trust over the proceeds Donn obtained as a result of his breach.

## COUNT VI:
## TEXAS THEFT LIABILITY ACT

120.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 114 hereof.

121.     NWB had a right to the property in its warehouse that was taken and sold by Donn without NWB knowledge or consent. Likewise, NWB also had a right to its own services in its shipping department, that Donn used for his personal gains without the knowledge or consent of NWB. Furthermore, NWB had a right to the profits from the sale of the products Donn sold in the amount of at least $940,659.66.

122.     Donn took those properties and services of NWB for his own personal gain.

123.     Donn also wrote checks for small amounts to initiate those shipments of property whose value was two, ten and sometimes a hundred times more than the value of the check he wrote.

124.     Donn also occasionally used NWB's credit card to initiate these transactions, paying nothing at all.

125.     Donn intentionally deprived NWB of the profits and property he stole because he thought no one would ever notice the transactions.

126.     The Plaintiff has been damages in the amount pled of at least $940,659.66.

127.     Plaintiff seeks its economic damages, the TLA additional damages, exemplary damages, pre- and post-judgment interest, court costs, and its reasonable and necessary attorney fees.

**COUNT VII:**
**UNFAIR COMPETITION**

128.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 122 hereof.

129.     Defendant has engaged and will continue to engage in illegally using and displaying the NWB Marks in violation of the Lanham Act.

130.     Defendant improperly uses, and will continue to use, NWB' confidential information in furtherance of the operation of his own distribution company built on the back of NWB, which

DocuSign Envelope ID: 9B82C52C-9A1C-46C5-B3EB-E0BD0A80C5E9

competes directly with NWB, by directly soliciting NWB's customers who were previously only known by NWB.

131.    Defendant has and will continue to unfairly profit from using the NWB Marks and good will and proprietary information to confuse, mislead, and/or deceive current and prospective NWB customers into obtaining goods and services from Vine Collective because he still appears to be partnered with NWB.

132.    Through his actions, Defendant is intentionally attempting to deceive NWB's current and prospective customers for Defendant's business gain.

133.    As a direct and proximate result of Defendant's actions, NWB has suffered and continues to suffer irreparably injury and is entitled to monetary damages in an amount to be determined at trial.

## COUNT VIII:
## VIOLATION OF TEXAS'S
## DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

134.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 128 hereof.

135.    Defendant is using the NWB Marks to identify the services provided from his company as those of a NWB partner. However, Defendant is actually providing the services through his own company.

136.    Defendant' use of the NWB Marks has caused confusion, cause mistake, and/or deceive as to his affiliation, connection, or association with NWB, or as to the origin, sponsorship, or approval of his goods, services, or commercial activities, and is likely to do so into the future.

137.    Defendant has and will continue to use the NWB Marks, goodwill, and confidential information to lure customers who believe that he or she is obtaining services from a partner or shareholder of NWB.

DocuSign Envelope ID: 9B82C52C-9A1C-46C6-B3EB-E0BD0A80C5E9

138.     The unlawful conduct of Defendant described herein constitutes unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Texas Statute 501.204(1).

139.     As a direct and proximate result of Defendant' wrongful conduct, NWB has suffered damages to the value of the NWB Marks and to customer goodwill and has not received monies owed pursuant to the Defendant's phony sales.

140.     Defendant' acts have been and are being done knowingly and intentionally to cause confusion, to cause mistake, and/or to deceive.

141.     As a result, NWB has suffered and continues to suffer irreparable injury and has incurred and continues to incur monetary damages in an amount to be determined at trial.

## COUNT IX:
## UNJUST ENRICHMENT

142.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 136 hereof.

143.     Defendant has knowingly and intentionally misappropriated confidential information in furtherance of his operation of the Vine Collective Distributor from the same location as NWB hired him to be its sales manager.

144.     Defendant has used and will continue to use the proprietary and trade secret information of NWB, and will continue to display the NWB Marks (or marks similar thereto) in order to confuse, mislead, and/or deceive others in violation of the Lanham Act.

145.     Defendant used his position within EXP to gain the trust of NWB's customers, and to lie to them about his status as a shareholder of NWB and NWB's so-called partnership with Vine Collective. Defendant was aware these statements were made to confuse customers into paying him instead of NWB, such that NWB expects to be compensated and that Defendant should compensate NWB for his use of the NWB Mark, confidential information, and good.

146.    Defendant knowingly retained these benefits in an amount equal to or more than $940,659.66, to which he is not rightfully entitled, at the expense and to the damage of NWB.

147.    There is no adequate remedy at law that will protect NWB from continued irreparable injury or fully compensate it for the damage caused by Defendant' wrongful conduct.

## PRAYER

WHEREFORE, Plaintiff requests judgment with each item of this prayer being for relief additional to, and alternative to each other item and not an election of remedies, as follows:

A. The entry of a preliminary and permanent injunction prohibiting Defendant and his respective agents, representatives, servants, employees, attorneys, officers, directors, shareholders, licensees, affiliates, joint venturers, parents, subsidiaries, related corporations and companies, and all others in privity or acting in concern with them, from:

 i.  Using the NWB Marks and logos and any confusingly-similar marks;

 ii.  Otherwise suggesting that Defendant is affiliate of, partnered with, sponsored by, or endorsed by NWB in any manner;

 iii.  Using NWB's Confidential Customer List and Customer Information;

 iv.  Engaging in any other activity constituting unfair competition or trademark infringements;

 v.  Assisting, aiding, or abetting another person or business entity in engaging in or performing any of the activities enumerated above.

B. The entry of a preliminary and permanent injunction ordering Defendant to return all Confidential Information to Plaintiff;

C. The entry of a preliminary and permanent injunction of profit disgorgement Donn received as a result of his breach of fiduciary duties to NWB;

DocuSign Envelope ID: 9B82C52C-9A1C-46C6-B3EB-E0BD0A80C5E9

D.  Appointing a receiver over the business of Alec Donn which was created using the stolen profits from NWB as a result of his breach of fiduciary duty;

E.  Creating a constructive trust for the $940,659.66 in stolen profits;

F.  Awarding exemplary damages and additional damage pursuant to the statutes listed above;

G.  Awarding reasonable attorneys' fees and costs pursuant to the statutes listed above;

H.  Awarding interest as allowed by law.

I.  Awarding such other and further relief as the Court deems just and proper.

<u>**DESIGNATION OF TRIAL COUNSEL**</u>

Plaintiff will be represented at trial by Adam Allen.


Dated: May 2, 2024

Respectfully submitted,

ALLEN & ASSOCIATES

By:  /s/ Adam Allen
      Adam Allen
      Texas Bar No. 24031124
      Email:  adam@aallenlaw.com
      2777 Allen Parkway, Suite 1000
      HOUSTON, TX 77019
      Tel. (832) 871-5920
      Fax. (281) 503-7671
      Attorneys for NWB Distribution, L.P.

## <u>VERIFICATION</u>

I, Christopher Jepson, being duly sworn, deposes and says:

I am Chief Executive Officer of Plaintiff NWB Distribution, LP. I have read the foregoing Verified Complaint and know the contents thereof and state that the allegations are all true and correct. I base this Verification on my own personal knowledge because I personally hired and worked with Alec Donn, and I personally handled the investigations mentioned in the Verified Complaint. The grounds of my knowledge, information, and belief, are derived from my position as Chief Executive Officer, my personal involvement in the events underlying this litigation, and general investigation of the facts and circumstances described in the Verified Complaint, including, without limitation, my review of Plaintiff's records and conversations with Plaintiff's employees, and my review of Plaintiff's files in support of a criminal investigation being conducted by the Financial Crimes Unit of the Houston Police Department, and my interviews with all of NWB's customers who were swindled by Alec Donn through his company Vine Collective which is the tradename of his Vine&Co, LLC and Vine & Co, LLC companies.

Dated: _5/6/2024_____

By: _____
      Christopher Jepson
      Chief Executive Officer
      NWB Distribution L.P.